**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CHARLES REYNOLDS, as PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF DANNY WHITE, deceased,
and DEBBIE AND MANUEL MORALEZ, individually.

      **Plaintiffs,**

**v.**                                        **No.**

ALBUQUERQUE POLICE DEPARTMENT,
CITY OF ALBUQUERQUE, OFFICER
JOSH JOHNSON, OFFICER MICHAEL
HARRISON, JOHN/JANE DOE SUPERVISOR,
And JOHN/JANE DOE DISPATCH OPERATOR,       **JURY REQUESTED**

      **Defendants.**

## COMPLAINT FOR WRONGFUL DEATH, DEPRIVATION OF CIVIL RIGHTS, AND VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

Plaintiffs, through counsel, Harvey & Foote Law Firm (Dusti Harvey and Jennifer Foote), Allegra Carpenter Law Firm (Allegra Carpenter), and the Law Office of Frances Crockett (Frances Carpenter), bring this civil rights complaint under 42 U.S.C. § 1983, 42 U.S.C. § 12132 and Section 504 of the Rehabilitation Act, the Fourth Amendment of the United States Constitution, and the New Mexico Tort Claims Act for damages resulting from the unlawful seizure and excessive force causing the wrongful death of Danny White, by Defendants.

## JURISDICTION, PARTIES, AND VENUE

1.       Jurisdiction and venue are proper as all of the parties reside in New Mexico and the acts complained of occurred exclusively within Bernalillo County, New Mexico. Jurisdiction and venue are proper pursuant to New Mexico law, 42 U.S.C. § 1983 and 1988, and 28 U.S.C. § 1343.

2.      Plaintiff Charles Reynolds ("Plaintiff Reynolds") is the personal representative of the wrongful death estate of Danny White, who was forty-three (43) years old at the time of his death, and a resident of Bernalillo County.   The Second Judicial District Court appointed Plaintiff Reynolds as personal representative of Danny White's estate in accordance with NMSA 1978 § 41-2-1 et seq., on May 19, 2021. (Case Number D-202-CV-2021-03032).

3.      Plaintiffs Debbie and Manuel Moralez are individuals and the parents of Danny White, and were at all times material to the complaint residents of Bernalillo County.

4.      Defendant Officer Josh Johnson, Man #P5806 ("Officer Johnson") is an individual employed by the City of Albuquerque as a police officer.   At all material times, he was acting in the course and scope of his employment and under color of state law.

5.      Defendant Officer Michael Harrison, Man #P5173 ("Officer Harrison") is an individual employed by the City of Albuquerque as a police officer.   At all material times, he was acting in the course and scope of his employment and under color of state law.

6.      Defendant Albuquerque Police Department ("APD") is a police department operating within the City of Albuquerque, County of Bernalillo, State of New Mexico, and was at all times material hereto the employer of Defendants Johnson and Harrison.

7.      Defendant John/Jane Doe Supervisor is responsible for, among other things, training Defendant APD Officers, including Officers Johnson and Harrison, and is an individual employed by the City of Albuquerque. At all material times, he/she was acting in the course and scope of his/her employment and under color of state law.

8.      Defendant John/Jane Doe Dispatcher is responsible for, among other things: conveying information from 911 callers to officers they dispatch to respond to the calls; obtaining

a Crisis Intervention Team ("CIT") officer who is specifically trained to handle a call such as the initial 911 call in this case; researching the suspect individual using the CIT case management and Real-Time Crime Center database; and providing all obtained information to dispatched or responding officers, including Officers Johnson and Harrison; and is an individual employed by the City of Albuquerque. At all material times, he/she was acting in the course and scope of his/her employment and under color of state law.

9.      Defendant City of Albuquerque ("COA") is a municipality operating within the County of Bernalillo.

10.     Plaintiffs filed a timely Tort Claim Notice placing Defendants on notice of this claim.

## FACTS COMMON TO ALL COUNTS

### APD/COA's History and Notice of Violating the Rights of Albuquerque's Mentally Ill

11.     For decades, if not longer, APD and the City of Albuquerque (COA) have systemically deprived Albuquerque's mentally ill of their constitutional civil liberties and statutory rights to have their disability and disease accommodated.

12.     Prior to 2014, the United States Department of Justice (DOJ) launched an investigation into APD's policies and practices due to then-heightened concerns that APD engaged in a pattern and/or practice of use of excessive force in violation of the Fourth Amendment and Law Enforcement Act of 1994, 42 U.S.C. § 14141, including but not limited to violations against the mentally ill.

13.     At that time, Albuquerque's APD was one of only 18 law enforcement agencies throughout the country that found itself operating under a consent decree brought on by the DOJ based on having a "culture of aggression" toward its inhabitants.

14.     On April 10, 2014, the DOJ issued a public letter to the COA outlining its findings and recommending remedial measures.  The DOJ found reasonable cause to believe that APD engages in a pattern or practice of use of excessive force. The DOJ determined that systemic deficiencies contributed to the pattern or practice of excessive force, and these deficiencies relate to numerous operational and structural areas of APD, including hiring, training, policies, supervision, discipline, management, and oversight.

15.     It cannot be disputed that on any given day the average law enforcement officer will have an encounter with someone who suffers from a physical or mental disability whereas they may not encounter someone with whom it is necessary to draw their weapon or use force. Despite this, Albuquerque Police Officers' training is dedicated in large percentage to target practice and use of force training compared to how to effectively encounter and deal with persons who suffer from physical and mental impairments and disabilities.

16.     Ostensibly to remedy its deficiencies and to prevent future harm, APD/COA entered into a settlement agreement with the DOJ, promising to make numerous changes.

17.     Among the agreed-to changes was a promise to better address handling of the mentally ill and to maintain a sufficient number of crisis intervention certified responders who are specially trained officers across the Department who retain their normal duties and responsibilities and also respond to calls involving those in mental health crisis.

18.     APD agreed that "APD will ensure that crisis intervention certified responders or CIU [Crisis Intervention Unit] will take the lead, once on scene and when appropriate, in interacting with individuals in crisis.   If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or CIU on strategies for resolving the crisis when it is practical to do so."

19.     As part of the settlement, APD further promised to, among other things:

    a.  [R]eview, develop, and implement policies and procedures that fully implement the terms of the Agreement, comply with applicable law, and comport with best practices.
    b.  Apply policies uniformly and hold officers accountable for complying with APD policy and procedure.

19.     The settlement conditions were finalized in the October 31, 2014 Court Approved Settlement Agreement (CASA) which required, among other things:

    a.  [T]hat APD agree[s] "to minimize the necessity for the use of force against individuals in crisis due to mental illness or a diagnosed behavioral disorder and, where appropriate, assist in facilitating access to community-based treatment, supports, and services to improve outcomes for the individuals. APD agrees to develop, implement and support more integrated, specialized responses to individuals in mental health crisis through collaborative partnerships with community stakeholders, specialized training, and improved communication and coordination with mental health professionals."

**APD/COA Breaks Promises to DOJ, Albuquerque's Mentally Ill Population, and their Families**

20.     As evidenced in this case, APD promptly broke its promises to the DOJ and to the inhabitants of Albuquerque, with the tragic result of the unnecessary death of numerous mentally ill citizens, including Danny White.

5

21.     Danny White's death is not surprising considering that according to the United States Department of Justice's Yearly Monitor Reports, between 2014 and 2021, the APD/COA failed to make any meaningful efforts to comply with the CASA.

22.     Specifically, in a report dated November 2, 2020, the Monitor stated that based on the data reviewed, and the fact that more than half of the use of force cases reviewed in the monitoring period involved someone either in crisis or with a diagnosed mental health illness, "APD needs to rethink the way they interact with people experiencing mental or emotional crises."

23.     The Monitor notified APD/COA of its concerns regarding training of APD officers in interacting with people with mental illness.   The Monitor especially was concerned with the exclusion of the APD Mental Health Response and Advisory Committee from the decision-making regarding such training, stating:   "Rather than taking the opportunity to provide meaningful training in a much-needed area, APD failed to collaborate with internal and external partners to provide the best training possible to more appropriately service and care for a vulnerable population that disproportionately impacts its 'Calls for Service' workload….the monitoring team views this misstep as more evidence of APD's failures to adhere to the basic standards of duty of care that need to be accorded to people who are vulnerable, especially those who are experiencing some type of mental or emotional crisis."

24.     On September 2, 2021, the United States Department of Justice filed a progress and status summary related to the 2014 CASA, covering the time period of February 1, 2021 to July 31, 2021.   Case 1:14-cv-01025-JB-SMV Document 847 Filed 09/02/21.

25.     In this report, APD promised that, in compliance with the 2014 CASA, it "will ensure that crisis intervention certified responders or [Crisis Intervention Unit] CIU will take the

6

lead, once on scene and when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input of the crisis intervention certified responder or [Crisis Intervention Unit] CIU on strategies for resolving the crisis when it is practical to do so."

26.     Though the CASA required (and requires) APD to maintain the number of crisis intervention certified responders deemed necessary by APD's staffing assessment and resource study, APD has failed to support this effort with the necessary data and IT infrastructure, including but not limited to its failures with the critically important dispatch unit.

27.     The CASA also requires APD to "maintain a sufficient number of crisis intervention certified responders who are specifically trained officers across the Department who retain their normal duties and responsibilities, and also respond to calls involving those in a mental health crisis."

28.     In 2020, the stated "goal" of the APD Crisis Intervention Team was to provide an effective response to situations involving people who might be mentally ill or in crisis. The Crisis Intervention Team works with people in the Albuquerque Community who exhibit chronic behavior patterns that may pose risks to themselves or others.   **One of the team's primary goals is to ensure that situations involving people in crisis are defused so that force may be avoided and proper medical attention or referral to an appropriate follow-up agency is provided.**[1]

29.     Upon information and belief, APD/COA has still not met this goal.

30.     It is a well-understood fact that the Dispatch Operator plays a critical role in the management of APD response to cases involving the mentally ill.

---

1 https://www.cabq.gov/police/programs/crisis-intervention

31.     Accordingly, Standard Operating Procedure (SOP) 2-19 specifically addresses this topic.   SOP 2-19 was in effect on April 4, 2021.

32.     Pursuant to SOP 2-19, Defendant Dispatch Operator was responsible for knowing and understanding APD SOP 2-19, which mandated at the time of Mr. White's interaction with police and dispatch:

a.      That the communications dispatch operator is to use their training and experience to identify calls that indicate the individual may be affected by a behavioral health disorder or a behavioral health crisis, and if so, will dispatch an Enhanced Crisis Team Intervention (ECIT) officer or Mobile Crisis Team (MCT), when appropriate and available. That was not done in this case.

b.      That officers "must apply their training to recognize behaviors and signs that indicate the individual may be affected by a behavioral health disorder or is in a behavioral health crisis and adapt police responses accordingly."

c.      In responding to an individual experiencing a behavioral health crisis, officers will attempt to de-escalate and calm the situation if feasible when possible, until a supervisor, Enhanced Crisis Team Intervention Officer, or Mobile Crisis Team arrives to control the scene and direct operations.

d.      Once on scene, the Enhanced Crisis Team Intervention Officer, Mobile Crisis Team or Crisis Intervention Unit (CIU) will take the lead in interacting with individuals in a behavioral health crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek input from Enhanced Crisis Team Intervention Officer, Mobile Crisis Team, or Crisis Intervention Unit on strategies for de-escalating, calming and resolving the crisis, when safety allows such consultation.

e.      The responding officer will request a backup officer whenever the individual will be taken into custody (either for booking or for emergency mental health evaluation). The officer should specifically request an Enhanced Crisis Team Intervention Officer as a backup, unless the requesting officer is an Enhanced Crisis Team Intervention Officer.

f.      When possible, officers should gather information from acquaintances, or family members. Attempt to find out the nature of the crisis the individual is experiencing. Request Mobile Crisis Team professional assistance, if available and appropriate, to assist in communicating with and calming the person, when Enhanced Crisis Team Intervention Officers are unable to make progress in de-escalating the

8

situation and the scene situation is safe enough for a clinician to engage with the individual person.

33.     As demonstrated below, the dispatch unit did not achieve the letter or spirit of this protocol on April 4, 2021.

34.     In addition to explicit violations against the mentally ill, APD has compounded the danger to Albuquerque inhabitants by its continued use of physical maneuvers that are unnecessary and lethal.

35.     Despite many jurisdictions outlawing face-down positional asphyxiation across the nation by the end of 2020, APD still authorized it with the following procedure, which was not followed in this case:

> Albuquerque Police Department's Standard Operating Procedures 2-52-6 Use of Force Procedures states at paragraph 5: "In situations when the individual is forced into a face down position, officers shall release pressure/weight from the individual and position the individual on their side or sit them up as soon as they are restrained and it is safe to do so. Officers shall monitor the individual for any breathing problems or any other signs of distress."

36.     APD was long on notice that its policies regarding use of force were excessive. Testimony of the City of Albuquerque's own police training expert (a training officer for the City of Albuquerque), established that the training provided to City of Albuquerque police officers on the use of deadly force, is not reasonable and is designed to result in the unreasonable use of deadly force. *See, Findings of Fact and Conclusions of Law, NO. CV 2009-0915, Honorable Judge Theresa Baca, dated June 7, 2011, at ¶66-67.*

**Events of April 4, 2021 that Led to the Unnecessary and Cruel Killing of a Mentally Ill Man, Danny White**

37.     On April 4, 2021 (Easter Sunday), APD killed a man with Huntington's disease.

38.     At approximately **1:15 p.m.**, the APD 911 system received a call for assistance at 3112 Ronda De Lechusas, NW, in Albuquerque, New Mexico, the home of Debbie and Manuel Moralez, where Danny White resided.

39.     Family member Marlena Daniel called 911 due to an incident that had developed between Danny and Manuel related to the air conditioner.

40.     Danny White suffered from a genetic disorder called Huntington's disease that manifests itself in adult years.  This genetic condition causes, among other things, occasional aggressiveness.

41.     Danny White and his Huntington's disease and condition were known to APD and its Crisis Intervention Team (CIT) unit.

42.     The receiving dispatch officer understood that Danny was suffering from a mental health condition



when he/she received the call and gave reassurances to the family member, Ms. Daniel (sister of Danny White), that the nature of the mental illness episode was understood.

43.     Ms. Daniel provided the name and location of Danny White's doctor and hospital.

44.     Ms. Daniel repeatedly told the 911 operator that Danny had no weapons and that he had not injured anyone.

45.     Ms. Daniel requested that a CIT officer respond to the call.   She specifically requested Officer Padilla, Danny's case agent who had successfully interacted with Danny on previous occasions.

46.     The dispatch unit did not send Officer Padilla or another CIT officer, but issued a standard call for response to a "battery against a household member."

47.     Meanwhile, the dispatch officer reassured Ms. Daniel that "Hopefully we'll get him the help that he needs."   She indicated that the officers "might be able to transport [Danny] to UNMH to be evaluated."

48.     The dispatch call ended when Ms. Daniel indicated that "two officers just walked up."

49.     Almost one hour elapsed between Ms. Daniel placing the 911 call, and the time that it took for the officers make contact with the family, according to the CAD report. The officers then spent some time outside the home before entering and making contact with Danny.

50.     Consequently, the episode that had precipitated the call was long over by the time officers arrived.

51.     In this non-emergency moment, the family was seeking assistance in managing Danny's mental episode to get him calmly into the hands of medical professionals.

52.     What unfolded was a tragic departure from not only the family's expectations in the moment, but the DOJ's interventions to raise the standard of Albuquerque's handling of the mentally ill, and APD protocols.

**APD Officers Arrive at the Moralez Home**

53. Instead of seeking out CIT specialists, dispatch sent the Moralez family Officers Johnson and Harrison, who had no prior knowledge of Danny White, his condition, or education related to Huntington's disease.

54. Uninformed, untrained, and under-supported, Officer Michael Harrison and Officer Josh Johnson arrived at the Moralez residence with instructions to respond to a "domestic violence" situation.

55. On the sidewalk outside the home, Officer Johnson encountered concerned family members who tried to advise the officers that Danny had Huntington's disease, which is a neurological condition. The family offered to assist in any way with working with Danny. The family extensively discussed with Officers Johnson and Harrison the need for Danny to receive mental/medical health assistance.

56. Manuel, Danny's stepfather who was involved in the earlier incident with Danny, explained he did not want to press charges, did not himself need medical assistance, and only wanted Danny to receive help. This was all communicated to both officers before they made contact with Danny.

57. Debbie, Danny's mother, explained that Danny needed to be taken to UNM's psychiatric unit.

58. When Danny's brother explained about Huntington's disease, Officer Johnson responded, "I'm not familiar with that one." Danny's brother informed the officer that, "It comes with a lot of baggage… It's a disorder that messes with your nerves, but after that comes, it starts to get to your brain."

59.     Incorrectly, Officer Johnson indicated to the family that he could not transport Danny to the hospital unless Danny agreed to do so.   Pursuant to Section 43-1-10 NMSA 1978 APD had the authority to transport Danny to a medical/mental facility.

## Chapter 43: Commitment Procedures
## Article 1: Mental Health and Developmental Disabilities, 43-1-1 through 43-1-25
## Section 43-1-10: Emergency mental health evaluation and care.

**Universal Citation:** NM Stat § 43-1-10 (1996 through 1st Sess 50th Legis)

**43-1-10. Emergency mental health evaluation and care.**

A. A peace officer may detain and transport a person for emergency mental health evaluation and care in the absence of a legally valid order from the court only if:

(1) the person is otherwise subject to lawful arrest;

(2) the peace officer has reasonable grounds to believe the person has just attempted suicide;

(3) the peace officer, based upon his own observation and investigation, has reasonable grounds to believe that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or others and that immediate detention is necessary to prevent such harm. Immediately upon arrival at the evaluation facility, the peace officer shall be interviewed by the admitting physician or his designee; or

(4) a licensed physician or a certified psychologist has certified that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or others and that immediate detention is necessary to prevent such harm. Such certification shall constitute authority to transport the person.

B. An emergency evaluation under this section shall be accomplished upon the request of a peace officer, or jail or detention facility administrator or his designee, or upon the certification of a licensed physician or certified psychologist as described in Subsection C of this section. A court order is not required under this section. If an application is made to a court, the court's power to act in furtherance of an emergency admission shall be limited to ordering that:

(1) the client be seen by a certified psychologist or psychiatrist prior to transport to an evaluation facility; and

(2) a peace officer transport the person to an evaluation facility.

60.     Either intentionally or out of absolute lack of training and sensitivity, Officers Johnson and Harrison approached the management of Danny White in a manner that was inapposite to the goal of deescalating Danny's Huntington's disease-driven crisis.

13

61.     In a display of ignorance, Officer Johnson, who apparently had no training about or knowledge of Huntington's disease, proclaimed in response to the family's request for medical assistance, "The hospital, no matter what it is, it's going to be a temporary solution."

62.     Debbie Moralez, mother of Danny White, responded,

"…But at least the doctors then can adjust medications or treat him again.   I just saw his doctor this last week, and they upped his medications because of the suicide, and the thoughts, and he didn't think he was in any danger, because he wasn't having the thoughts like, daily.   But he was having enough that the psychiatrist said, 'no, we're going to up the medication.'   So they upped the sertraline, which is like the Zoloft, and then they upped the Risperdal."

63.     The officer proceeded to enter Danny's bedroom, where he was watching his favorite movie, disturbing no one and threatening no one.

64.     The most important thing the officers needed to do was give Danny time and space. They gave him neither.

65.     There was no justification for the officers to rush to apprehend Danny.   The officers knew that Danny did not have weapons or access to weapons.   They knew that no family members were under threat.

66.     When asked, "May I come in and talk to you?" Danny's response was "No."

67.     Although dispatch or the officers should have done so earlier, this moment presented a perfect time for Officers Johnson and Harrison to call in for CIT assistance.   Danny was simply watching TV in his room.

68.     This was not a crisis moment and Danny could go nowhere.

14

69.     Nothing prevented the officers from securing the scene and waiting for CIT and/or EMT assistance to calmly address Danny's needs and get him needed medical support.

70.     However, at this time neither Officer Johnson nor Harrison called for CIT or paramedic support.

71.     They instead used vocabulary with Danny that invited a "fight."

72.     The APD had no reason in this moment to treat Danny as a threat to themselves or anyone.   They knew that the family wished only to get Danny assistance.   He was a mentally ill soul in need of help.   Rather than treat him in the manner that the Constitution or the ADA require, the officers decided to escalate their encounter with Danny White.

73.     Officer Johnson and Harrison then engaged in an exchange related to "10-15" charges in order to "force transport."

74.     At this point the officers had been in the Moralez home less than ten minutes.

75.     "10-15" is "Domestic Fight" under APD's Ten-Code.   There was no domestic fight underway with this mentally ill man, and whatever altercation had led to the call to APD had long since ended.

76.     Despite the absence of an emergency or threat, and despite having not called for CIT assistance, Johnson put on gloves and told Officer Harrison they would enter Danny's room, where he was seated alone with his feet reclined, with no weapons or access to weapons.

77.     Officer Harrison yelled out to Danny's mother, "Is it [his name] Justin?"   She responded that it is Danny.   Danny remained in his recliner, with his leg twitching up and down.

78.     Officer Johnson entered the room, which clearly upset Danny.

15

79.     Though Danny's disease caused his leg to move up and down, instead of appreciating this medical condition, Officer Johnson heightened tensions by exclaiming that Danny was "making [me] nervous with his movements."

80.     Officer Johnson spoke into his radio "He's saying that he wants to go with a fight, put a note on the CAD…I do have a misdemeanor, 10-15 [domestic fight]."

81.     Officer Johnson received a radio communication inquiring if Danny was presenting a threat to officers or others, to which Johnson stated "yes, towards other individuals in the house….he is very animated with his fists, extreme bouts of rage…he's staying seated, but if he stands up, it's going to be a fight."

82.     Officer Johnson turned into the hallway, and Danny told Officer Harrison to leave as he was ruining Danny's movie.   Officer Harrison refused to leave and Danny rose up from his recliner.   Officer Harrison responded by raising his Taser at Danny.   Danny told the officers to leave or shoot him.   Danny entered the hallway and stated he was not going with the officers.   He stated that he was an adult. Danny repeated that he did not want to go with the officers and they would have to shoot him.   "Shoot me, shoot me," he said.

83.     Officer Harrison pointed his Taser at Danny.

84.     The officers did not retreat or seek CIT backup.

85.     Officer Johnson, at this point behind Danny, rushed him and attempted a rear take down, taking Danny to the ground.

86.     Officer Harrison holstered his Taser and sat on Danny's legs while the officers attempted to place Danny's hands behind his back.   They placed him in handcuffs.

87.     While on top of him, the officers held Danny down in this position for approximately three (3) minutes, during which Danny visibly convulsed, clearly gasped for air, and asked the officers to "stop."

88.     Danny vomited and his body became still.     Danny also lost control of his bladder.

89.     Officer Johnson and Harrison left Danny in handcuffs and Johnson performed CPR until Albuquerque Fire Department Rescue (AFR) arrived and asked to have the handcuffs removed so they could perform CPR in an attempt to try and revive Danny.

90.     Officer Lucero arrived as backup to Officers Johnson and Harrison at 2:38 pm.   At 2:41 pm, Sergeant Monte directed Officer Lucero to remove the handcuffs from Danny so Albuquerque Fire Rescue could have both of Danny's arms free for continued CPR.

91.     Albuquerque Ambulance Service arrived at 2:43 pm and observed AFR performing CPR, which continued until 3:41 pm, when AFR called Dr. Decker who terminated the treatment, as there were no contractions in Danny's heart.

92.     The Office of the Medical Investigator (OMI) investigated Danny White's death and issued an autopsy report.   This report shows that the autopsy examination revealed a man with bruises of the face, trunk and extremities, and scrapes of the trunk and extremities.   The report noted bruising from handcuffs.   The OMI found:

    a.   Ruptured blood vessels.

    b.   Petechial hemorrhages in the eyelids.

    c.   Petechial hemorrhages on the upper right back, associated with bleeding in the underlying soft tissues of the back.

    d.   An area of bleeding in the muscles of Danny's back

  e. An enlarged heart with an increased oxygen requirement.

93. OMI reflected that Officers placed him on the floor on his stomach, a position which can compromise breathing, particularly in the presence of obesity with increased abdominal fat. Officers then held him down, which can restrict the ability of the chest to expand during breathing. This combination of conditions reduced Mr. White's ability to breathe, reduced the supply of oxygen to the heart and led to his death.

94. The OMI determined that the manner of Danny White's death was homicide.

95. Despite Albuquerque Police Department's Standard Operating Procedures 2-52-6 Use of Force Procedures that requires officers to release pressure when restraining an individual and to monitor for signs of distress, Danny White was left to suffocate under the weight of Officer Johnson.

96. It is clear from the video that the Defendant Officers did not release pressure/weight from Danny White once he was handcuffed and continued to put pressure on him even after he stopped moving.

97. Gilbert Gallegos, an Albuquerque Police Department spokesman, said officers Michael Harrison and Josh Johnson were found to have violated policy in the use-of- force procedures with Danny White. "They were given non disciplinary corrective action," Gallegos said.

98. There are many errors that led to the tragic and gruesome death of Danny White:

  a. Failure of APD/COA to heed the call of DOJ and society to provide better and more thoughtful response care for the mentally ill, and have at the ready sufficient numbers of sufficiently trained CIT officers;

b.     Failure of APD/COA to train its dispatch officers to direct cases involving mental illness to mental illness specialists in the CIT unit;

c.     Failure of APD/COA to train all officers to address non-crisis moments involving the mentally ill with patience in order to allow time for a specialist in mental illness to arrive; to allow time for the individual to calm down from an episode; and to not provoke an individual who is not otherwise creating a disturbance.

d.     Failure of APD/COA to prohibit positional asphyxiation as a detaining maneuver in light of its high likelihood of causing serious injury or death.

99.     Instead of waiting for someone from the Crisis Intervention Training division or seeking further guidance from their supervisor, or even conferring with one another about the best approach to use in this situation, these officers (and the dispatch unit) chose to treat this not as a mental illness call seeking help for a family member with a mental health diagnosis and visible disability, but instead as domestic violence disturbance:

100.     The officers chose to shout commands at a fragile Danny, they ignored his requests, pointed Tasers at him, and audibly spoke that there would be "a fight."

**APD Actions and Admissions in the Aftermath of the Danny White Homicide Demonstrating Feasibility of Having Done so Before**

101.     On May 3, 2021(one month after Danny's death) APD Chief Harold Media issued a special order in which the APD Use of Force Police 2-52-5 was updated to add changes concerning placing individuals in the prone position, including but not limited to stating that "[w]hen possible, officers should avoid placing individuals in the prone position."

19

102.     As of February 2021, the COA and Department of Justice proposed to bring in an outside team to temporarily assist the APD's internal affairs investigators, correct issues as they arise, and train detectives on how to better do their jobs.[2]

103.     The aforementioned parties worked out an order proposing the creation of an External Force Investigation Team, or EFIT, which will be made up of investigation experts and overseen by an administrator. Its members will accompany APD's internal affairs investigators to the scene after officers use force that causes injury, hospitalization or death.

104.     The aforementioned was as a result of a stipulated order, filed in federal court and agreed to by the COA, the DOJ and the independent monitor overseeing the police reform effort.

105.     The independent monitor[3] published a report in November 2020, that said APD had failed at every level to police itself. In his latest report, monitor James Ginger, looking at the period from Feb. 1 through July 31, 2020, found that officers failed to report use of force, detectives in the Internal Affairs Force Division were "going through the motions" in their investigations, APD leadership allowed subpar work, and the then-chief of police signed off on it.

106.     Assistant City Attorney Lindsay Van Meter said that initially the DOJ lawyers said Ginger's report findings are grounds to hold the COA in contempt, which could lead to its being put under receivership[4.]

107.     On October 20, 2020, Federal Monitor James Ginger had this to say about APD and his 12th Independent Monitors Report:

---

2 See *U.S.A. City of Albuquerque,* 1:14-CV-01025 JB/SMU, [Doc. 692], Joint Motion for Entry of Stipulated Order Establishing an External Force Investigation Team.
3  The monitor evaluates the progress the city has made complying with the Court Approved Settlement Agreement it entered after the DOJ found in 2014 that officers had a pattern and practice of excessive force.
4  https://www.abqjournal.com/2359745/city-doj-agree-on-outside-team-to-help-oversee-apd.html

*We are on the brink of a catastrophic failure at APD. … [The department] has failed miserably in its ability to police itself. … If this were simply a question of leadership, I would be less concerned. But it's not. It's a question of leadership. It's a question of command. It's a question of supervision. And it's a question of performance on the street. So as a monitor with significant amount of experience – I've been doing this since the '90s – I would have to be candid with the Court and say we're in more trouble here right now today than I've ever seen."*

108.    In his 13th Independent Monitors Report, the federal monitor wrote:

*"This monitor's report can be synopsized in a single sentence. Due to a catastrophic failure in training oversight this reporting period and similar failures at the supervisory and command levels of APD, the agency suffered a 9.9%-point loss in compliance elements related to the training and supervisory functions at APD and a 7.8% loss in overall compliance …. Overall, there is an argument to be made that operational compliance rates have held relatively steady, at slightly less than 60 percent, since IMR-8, two and one-half years ago."*

*…*

*"APD is willing to go through almost any machination to avoid disciplining officers who violate policy or supervisors who fail to note policy violations or fail to act on them in a timely manner. …"*

*"At this point, the disciplinary system at APD routinely fails to follow its own written policy, guiding disciplinary matrices, and virtually decimates its disciplinary requirements in favor of refusals to recognize substantial policy violations, and instead, often sustaining minor related violations and ignoring more serious violations.*

*… it continues to be apparent that APD has not had and currently does not have an appetite for taking serious approaches to control excessive or unwarranted uses of force during its police operations in the field. Command and control practices regarding the use of force continue to be weak. APD continues to lack the ability to consistently "call the ball" on questionable uses of force, and at times is unable to "see" obvious violations of policy or procedure related to its officers' use of force."*

109.    In April 2021, the Mental Health Response and Advisory Committee (MHRAC) was available and willing to provide assistance, advice and guidance to the Albuquerque Police Department (APD) in the areas as they relate to law enforcement interaction with those experiencing mental health crises. At all times material, MHRAC was continuing to interact with

21

law enforcement in the area of policies, training, available resources and information sharing. However, the City's response to MHRAC being directly involved and realizing the benefit of having an advocate to come alongside APD officers and provide them direction and guidance in these areas has been met with resistance and delay. This prompted the Chairs of MHRAC to submit a letter regarding this issue to the Honorable James Browning on May 25, 2021[5].

110.    As a result of Officers Johnson and Harrison's excessive force, the COA's negligent hiring, retention, and training of Officers Johnson and Harrison, and Defendant John/Jane Doe's negligent supervision and training of Officers Johnson and Harrison, Debbie Moralez lost her son, Manuel Moralez, Sr., lost his stepson, and Danny White's adult children, Kobi White and Natasha White, lost their father.

## COUNT I – *MONELL* CLAIM

111.    The City is charged with the responsibility for appointing, supervising, training, instructing, disciplining, and promoting Albuquerque Police Department officers, including the named Defendants herein.

112.    Prior to April 2021, the City developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Albuquerque, New Mexico.

113.    At all times material to this Complaint, the Albuquerque Police Department exercised unconstitutional policies and procedures for dealing with mentally ill persons and maintained an unconstitutional failure to train police officers to peacefully deal with mentally ill persons. See *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (holding that the inadequacy of

---

5 Case 1:14-cv-01025-JB-SMV Document 812-1 Filed 05/28/21.

police training may serve as the basis for § 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact").

114.     It was the policy and/or custom of the Albuquerque Police Department to inadequately investigate use of force by officers.

115.     In addition, the Albuquerque Police Department failed to properly ensure that officers and dispatch such as the named Defendants herein were qualified, trained, supervised, and properly knew how to use crisis intervention and procedures to deal with person who have mental disabilities as well as certain methods of force.   The APD also failed to ensure that officers were told that they could not use said methods of force or interact with said persons, but rather call for someone who did have the requisite knowledge and specialized training.

116.     Defendants' use of deficient policies, training, supervision, and accountability systems as set forth and highlighted by the Department of Justice in *U.S.A. City of Albuquerque,* 1:14-CV-01025 JB/SMU, contributes to APD's violations of the Constitution and federal law. Defendants have been on notice of these deficiencies for years, but have not implemented sufficient reforms to ensure constitutional policing.

117.     Defendants failed to supervise officers effectively or hold them accountable for misconduct, contributing to a pattern of police actions that violate the Constitution and federal law.

118.     APD failed to adequately train and supervise its officers, including dispatch. This deficiency manifested itself in multiple ways, including a failure to guide officer activity through effective policies and training; a failure to collect and analyze reliable data to supervise officer enforcement activities; the lack of a meaningful early intervention system to identify officers who may benefit from additional training or other guidance to ensure that they do not commit

23

constitutional violations; and implementing properly the Crisis Intervention Team, training, and systems which are supposed to ensure that persons with mental disabilities are provided with properly trained officers who can adequately respond.

119.    As a direct result of Defendant City's unlawful conduct set forth above, Mr. White died**.**

**COUNT II – AGAINST OFFICERS JOHNSON AND HARRISON:**
**FOURTH AMENDMENT VIOLATION-**
**UNREASONABLE SEIZURE OF DANNY WHITE**

120.    Plaintiffs hereby incorporate by reference the allegations of the previous paragraphs as though fully set forth herein.

121.    Danny White had a Constitutional right to be free from an unreasonable seizure of his person.

122.    Defendants violated Danny White's Constitutional right to be free from unreasonable seizures when they tackled him, threw him down to the floor, and handcuffed his arms behind his back while holding a knee on his neck for three minutes, suffocating him.

123.    Defendants had no suspicion of felony criminal activities when they approached Danny White in his home.   He was simply suffering from a genetic condition called Huntington's disease.   Defendants were informed of his medical condition and were told by Danny's father and family that they did not want to press charges.   Danny was not armed and was not actively posing any immediate threat of harm to either officer when he was physically taken to the ground by the officers.

124.     Among other things, Defendant Johnson putting on his gloves in Danny's room was an act which any Crisis Intervention Team trained officer knows could cause an adverse reaction in the subject.

125.     Among other things, Defendant Harrison pointing his Taser at Danny White was excessive force.

126.     As a result of Defendants' conduct as set forth above, Danny White suffered damages including but not limited to, pain, suffering, and death.  The acts and omissions of Defendants were wrongful and were a cause of Danny White's death. Plaintiffs are entitled to recover all damages legally available under the New Mexico Wrongful Death Act, NMSA §41-2-1, including the loss of enjoyment of life, the monetary worth of his pain and suffering, the reasonable expenses of funeral and burial, together with all other damages that are fair and just.

127.     Defendants' conduct was willful, wanton, malicious, and in utter disregard and indifference for Danny White's legal rights, warranting imposition of punitive damages.

128.     Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to ask the court for reasonable attorney's fees and litigation expenses if Plaintiffs prevail.

### COUNT III - AGAINST DEFENDANTS JOHNSON AND HARRISON: FOURTH AMENDMENT VIOLATION- EXCESSIVE AND UNNECESSARY USE OF FORCE

129.     Plaintiffs hereby incorporate by reference the allegations of the previous paragraphs as though fully set forth herein.

130.     Danny White had a Constitutional right to be free of excessive and unnecessary force.

131.    Among other things, Defendant Johnson putting on his gloves in Danny's room was an act which any Crisis Intervention Team trained officer knows could cause an adverse reaction in the subject.

132.    Among other things, Defendant Harrison pointing his Taser at Danny White was excessive force.

133.    Officers Johnson and Harrison violated Danny White's Constitutional right to be free of excessive and unnecessary use of force by unlawfully seizing him, kneeling on his neck while handcuffing his arms behind him, sitting on him and restraining him, causing him to suffocate and die.

134.    As a result of Defendants' conduct as set forth above, Danny White suffered damages including but not limited to, pain, suffering, and death.  The acts and omissions of Defendants were wrongful and were a cause of Danny White's death. Plaintiffs are entitled to recover all damages legally available, including the loss of enjoyment of life, the monetary worth of his pain and suffering, the reasonable expenses of funeral and burial, together with all other damages that are fair and just.

135.    Defendants' conduct was willful, wanton, malicious, and in utter disregard and indifference for Dany White's legal rights, warranting imposition of punitive damages.

136.    Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to ask the court for reasonable attorney's fees and litigation expenses if Plaintiffs prevail.

## COUNT IV – STATE TORT CLAIMS AGAINST OFFICERS JOHNSON AND HARRISON FOR ASSAULT, BATTERY, FALSE ARREST, AND FALSE IMPRISONMENT

137.    Plaintiffs hereby incorporate by reference the allegations of the previous

paragraphs as though fully set forth herein.

138.    Plaintiffs properly notified Defendants and related agencies of their intent to sue as required by the New Mexico Tort Claims Act, preserving the New Mexico state law claims.

139.    The actions of Defendants were not justified or privileged under state law.

140.    Defendants were acting within the scope of their duties as police officers at the time of the incident.

141.    The Defendants assaulted, falsely imprisoned, and seized Danny White, and deprived him of rights, privileges, and immunities secured as a matter of State and Federal Constitutions.

142.     The above-described actions by individuals against Danny White constituted a battery upon him within the meaning of Section 41-4-12 of the New Mexico Tort Claims Act.

143.    Defendants' excessive and unnecessary use of force against Danny White constitutes assault and battery.

144.    Defendants' conduct was willful, wanton, malicious, and in utter disregard and deliberate indifference for Danny White's legal rights, warranting imposition of punitive damages.

145.    As a result of Defendants' conduct as set forth above, Danny White suffered damages including but not limited to, pain, suffering, and death.  The acts and omissions of Defendants were wrongful and were a cause of Danny White's death. Plaintiffs are entitled to recover all damages legally available, including the loss of enjoyment of life, the monetary worth of his pain and suffering, the reasonable expenses of funeral and burial, together with all other damages that are fair and just.

## COUNT V – NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION

146.    Plaintiffs hereby incorporate by reference the allegations of the previous paragraphs as though fully set forth herein.

147.    Defendants COA and APD were negligent in the hiring, training, supervision and retention of Defendant Dispatch Operator and Albuquerque Police Officers Johnson and Harrison who killed Danny White.

148.    Defendants' negligence includes all things stated herein but not limited to:

a.      Inadequate screening, including inadequate mental health screening, of Albuquerque Police Officers Johnson and Harrison who killed Danny White, as perspective employees and failure to perform adequate "fit for duty" evaluations;

b.      By recommending Officers Johnson and Harrison for certification, thereby violating NMSA § 29-7-6A(6)-(7),  requiring evidence that the law enforcement candidate, "after examination by a certified psychologist, is free of any emotional or mental condition that might adversely affect his performance as a police officer…" and requiring that the candidate "is of good moral character."   Defendant City of Albuquerque failed to recommend "…only mentally stable police officers." *Narney v. Daniels*, 1992-NMCA-133, 115 N.M. 41.

c.      Inadequate management, training, and enforcement of policies regarding citizen encounters, proper police work, and knowledge of the law related to the use of deadly force for all named Defendants;

d.      Placement and retention of non-Crisis Intervention Team Albuquerque Police Officers Johnson and Harrison in a call that specifically requested Crisis Intervention Team

28

officers respond;

e.      Failing to ensure that Danny White was properly identified and logged into the system to make sure that only properly trained Crisis Intervention Team officers respond to calls in which he was involved;

f.      Failure to properly train Albuquerque Police Officers Johnson and Harrison on Crisis Intervention tactics, and ensure that they were qualified to handle calls such as the call regarding Danny White, and if they were not, to make sure they were trained to ensure the correct officer who was Crisis Intervention trained could intervene.

g.      Placement and retention of Albuquerque Police Officers Johnson and Harrison in direct community service and law enforcement positions; and

h.      Inadequate supervision of Albuquerque Police Officers Johnson and Harrison, who used unreasonable deadly force during the subject incident.

149.    As a result of Defendants' negligence in hiring, training, supervision and retention of Albuquerque Police Officers Johnson and Harrison, and as a result of Defendants' conduct as set forth above, Danny White suffered damages including but not limited to, pain, suffering, and death.

## **COUNT VI – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

150.    All previous paragraphs are incorporated herein by reference.

151.    APD is a public entity as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. Section 12131(1)(B).

152.    APD does not have sovereign immunity for claims arising under the ADA. 42 U.S.C. Section 12202.

153.    Danny White was a qualified individual with a disability as defined by the ADA. 42 U.S.C. Section 12131(2).

154.    The regulations promulgated by the Department of Justice to implement Part A of Title II of the ADA require each government entity to conduct a self-evaluation of its programs and services (or the lack thereof) related to persons with disabilities:

(a) A public entity shall, within one year of the effective date of this part [that is by January 26, 1993], evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments. [6 and 7]

155.    Section 504 has the same requirements. Thus, as of 1978, when Section 504 regulations went into effect, a government entity should have done the self-evaluation and subsequent modifications as aforementioned.[8]

156.    As set forth herein, COA has not met its disability law mandate nearly thirty years later and to date has still not modified its services, policies, and practices as required by the law and which has been required by the law for over thirty years and as such cannot argue that the conduct

---

6 28 C.F.R. §35.105(a)-(b); see 28 C.F.R. §35.151.
7 *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 857-60 (10th Cir. 2003) (both the self-evaluation and transition plan regulations are enforceable through a private action).
8 See 28 C.F.R. § 35.105(d) 150(d)(4).

of the named Defendants in this case was reasonable or that the COA acted in any way reasonable.

157.    COA failed to accommodate Mr. White's disability in the course of investigating him because they were not properly trained and because COA continues to fail to enforce its own policies and/or develop adequate policies recognizing the necessity of training for law enforcement in situations involving persons with disabilities, whether physical or mental, as set forth by a House Judiciary Committee Report:

> In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures. Such discriminatory treatment based on disability can be avoided by proper training.[9]

158.    On the basis of his disability, Danny White was denied the benefits of services, programs, and activities of the Albuquerque Police Department and City of Albuquerque, including but not limited to the benefits of:

a.      a Crisis Intervention Team officer on scene at the time of the encounter with law enforcement, despite the family's specific request and the fact that Danny had a Crisis Intervention Team file and had prior contact with Crisis Intervention Team Officer Padilla;

b.      encounters with officers properly trained to deal with citizens with mental illness;

---

9 H.R. REP. No. 101-485, pt. III, 101st Cong., 2nd Sess. 50, reprinted in 1990 U.S.C.C.A.N. 473.   See 28 C.F.R. §35, App. A, Subpart B (Department of Justice commentary that the "general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities").

c.     being treated with dignity by the government entity sworn to protect its citizens in the community; and

d.     being given proper accommodation given his disability in the course and duration of the officers' encounters with Mr. White.

159.   APD discriminated against Mr. White on the basis of his disability by providing him with a service that was not as effective in affording equal opportunity to obtain the same result as that provided to individuals without mental illness/disabilities.

160.   APD's decision not to use a member of its Crisis Intervention Team in its interaction with Mr. White was made with deliberate indifference and reckless disregard to Mr. White's rights.

161.    APD's repeated use of unreasonable force against individuals with mental health disabilities reveals that APD has consistently failed to make reasonable modifications necessary to avoid discrimination in violation of Title II of the Americans with Disabilities Act.

162.   Under the ADA, training APD officers on how to interact with individuals with mental health disabilities is a reasonable modification to policies, practices, and procedures to afford people with mental health disabilities the equal opportunity for a police intervention that is free from unreasonable force. APD has failed to provide the necessary training, however, resulting in APD officers often resorting too quickly to using force against individuals with mental health disabilities.

163.   Defendant APD and the City's decision to discriminate against citizens with mental illness, like Mr. White, directly caused Mr. White's wrongful death and damages as set forth herein.

164.   By its discriminatory practices, Defendant APD and the City acted intentionally, maliciously, and with reckless indifference and an award of punitive damages is necessary to punish

this conduct and prevent deprivation of rights to citizens in the future.

165.    Plaintiffs are entitled to reasonable attorney fees and costs if they prevail on this claim.

## COUNT VII-LOSS OF CONSORTIUM BY DEBBIE MORALEZ

166.    Plaintiffs hereby incorporate by reference the allegations of the previous paragraphs as though fully set forth herein.

167.    Defendants, through the acts and omissions stated herein caused the damages to Danny White and his mother, Debbie Moralez.

168.    Danny White was 43 years old at the time of his death.  His genetic condition, Huntington's disease, revealed itself gradually as Danny became older.

169.    After raising Danny to achieve independence, when Danny could no longer live on his own, Danny was welcomed back into the home of Debbie and Manuel Moralez.

170.    Due to their extended relationship with Danny, Debbie and Manuel had an extremely close and loving relationship with Danny.  They provided this to him, and he reflected back to them a relationship of love, gratitude, and caring.

171.    Additionally, Debbie and Manuel Moralez, while living in the same household as Danny, for approximately five years prior to his death, not only had a relationship of emotional dependence on one another, but also a financially interdependent relationship.  Danny paid his parents to live with them and have them take care of him. He provided his parents with not only monetary assistance, but also love and companionship. In return, his parents provided him with a roof over his head, care, shelter, and love and companionship.

172.    As Danny White's parents and caregivers in a mutually dependent emotional and

33

financial relationship, it was foreseeable that they would be harmed by the injuries sustained by their son, Danny White.

173.    As a result of the acts and omissions of Defendants herein, Danny's parents are forced to live without the companionship, guidance, love, enjoyment, and support of their son.

174.    As a direct result of the acts or omissions of Defendants herein, Danny White's parents suffered damages including emotional pain and suffering, loss of consortium, and loss of financial support.

## COUNT IX-LOSS OF CONSORTIUM BY MANUEL MORALEZ

175.    Plaintiffs hereby incorporate by reference the allegations of the previous paragraphs as though fully set forth herein.

176.    Defendants, through the acts and omissions stated herein caused the damages to Danny White and his stepfather, Manuel Moralez.

177.    Danny White was 43 years old at the time of his death.  His genetic condition, Huntington's disease, revealed itself gradually as Danny became older.

178.    After raising Danny to achieve independence, when Danny could no longer live on his own, Danny was welcomed back into the home of Debbie and Manuel Moralez.

179.    Due to their extended relationship with Danny, Debbie and Manuel had an extremely close and loving relationship with Danny.  They provided this to him, and he reflected back to them a relationship of love, gratitude, and caring.

180.    Additionally, Debbie and Manuel Moralez, while living in the same household as Danny, for approximately five years prior to his death, not only had a relationship of emotional dependence on one another, but also a financially interdependent relationship.  Danny paid his

parents to live with them and have them take care of him. He provided his parents with not only monetary assistance, but also love and companionship. In return, his parents provided him with a roof over his head, care, shelter, and love and companionship.

181.    As Danny White's parents and caregivers in a mutually dependent emotional and financial relationship, it was foreseeable that they would be harmed by the injuries sustained by their son, Danny White.

182.    As a result of the acts and omissions of Defendants herein, Danny's parents are forced to live without the companionship, guidance, love, enjoyment, and support of their son.

183.    As a direct result of the acts or omissions of Defendants herein, Danny White's parents suffered damages including emotional pain and suffering, loss of consortium, and loss of financial support.

## <u>COUNT X:   PUNITIVE DAMAGES</u>

184.    All previous paragraphs are incorporated herein by reference.

185.    As a direct result of the wrongful conduct of the Defendants as set out above, Danny White suffered injuries including wrongful death.

186.    For decades the Defendants have behaved recklessly with regard to excessive force and treatment of the mentally ill.

187.     Among other things, the Defendants exercised reckless behavior after they had been told that Danny's actions were a direct result of his Huntington's disease. Indeed, these officers, including but not limited to the 911 dispatch operator, had access to Danny's prior contacts with APD's CIT unit (Officer Padilla) and exercised deliberate disregard of these known facts in their encounter with Danny.

188.     In addition, these Defendants left Danny in a prone position in handcuffs until EMS requested that they remove the handcuffs and place him in another position. These Defendants overtly disregarded their own policy as set forth herein and failed to render proper aid to Danny in the face of his clear need for medical assistance.

189.     The scope and severity of Defendants' failures and actions and their deliberate indifference, including failure to train/supervise and intentional disregard for the welfare and safety of Mr. White constitute gross negligence, willful, wanton, reckless, malicious and/or intentional misconduct.

190.     Such conduct was undertaken by Defendants without regard to the health and safety consequences to citizens such as Mr. White.   Moreover, such conduct evidences such little regard for their duties of care, good faith, and fidelity owed to Mr. White as to raise a reasonable belief that the acts and omissions set forth above are the result of conscious indifference to Mr. White's rights and welfare.

191.     Plaintiffs seek compensatory and punitive damages in an amount to be determined by the jury, plus costs and any other relief to which Plaintiffs are entitled by law.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for the following relief:

a)     For compensatory damages;

b)     For hedonic damages;

c)     For punitive damages in an amount sufficient to deter the type of malicious conduct complained of herein against Defendant Harrison and Johnson;

d)     For attorneys' fees and costs; and,

e)       For pre-and post-judgment interest.

Respectfully Submitted by:

**LAW OFFICE OF FRANCES CROCKETT**

*/s/ Frances C. Carpenter*
Frances C. Carpenter
925 Luna Circle NW
Albuquerque, NM 87102
Office: 505.314.8884; Fax: 505.835-5658
frances@francescrockettlaw.com

Dusti Harvey
Jennifer J. Foote
Harvey & Foote Law Firm
9202 San Mateo Blvd. NE
Albuquerque, NM 87113
505-254-0000
Dusti@harveyfirm.com
Jennifer@harveyfirm.com

Allegra C. Carpenter
Allegra Carpenter Law Firm, LLC
500 Tijeras, NW
Albuquerque, NM   87102
505-340-6069
Allegra@AllegraCarpenter.com
*Attorneys for Plaintiffs*